## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

Edward C. Dedrick                              *
64 Quaker Lane
North East, Maryland 21901-1025               *
    Plaintiff,                     Civil number: _WDQ-07-429_____
                                              *
    vs.                             *


John Berry, Director                               ENTERED
Office of Personnel Management          *   FILED    RECEIVED
1900 E St., NW                              LOGGED
Washington, DC 20415-3551*
                                            JUL 0 1 2010

                                        *   AT BALTIMORE
                                            CLERK U.S. DISTRICT COURT
                                            DISTRICT OF MARYLAND      DEPUTY
    and
                                        BY
John McHugh, Secretary of the Army
Department of the Army                  *
101 Army Pentagon
 Washington, DC 20310-0101             *

    Defendants.                  *


        *    *    *    *    *    *

## MOTION FOR SUMMARY JUDGEMENT AND SUPPORTING

## MEMORANDUM

1. In Response to the Order of Judge William D. Quarles, Jr. dated 15 June 2010 the

Plaintiff files the ordered Motion for Summary Judgment and Supporting Memorandum.


2. PROCEDURAL HISTORY- Since Jan 2008

    Requests for Clarification were made by both the Defendant and the Plaintiff.

    The case was transferred to The United States Court of Appeals for the Federal

Circuit. The Federal Circuit ordered "Once a mixed case always a mixed case" and transfer to The United States Court of Appeals for the Fourth Circuit.

The United States Court of Appeals for the Fourth Circuit ordered the case remanded to the District of Maryland as the Fourth Circuit stated that the District Court had not issued a FINAL ORDER as it disposed of FEWER THAN ALL THE CLAIMS.


3. The Claims to be addressed for the Final Order are:

- Improper termination of the Plaintiff's employment. The Plaintiff was terminated from employment on 4 August 2005.

- Defendants violating the Plaintiff's Fifth Amendment rights to due process.

- Defendant-Army violating the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 701, *et seq.*, for employment discrimination on the basis of a disability by an employer which constitutes a program or activity receiving federal financial assistance.

- Defendants violating Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12101, *et seq.* for employment discrimination on the basis of a disability.

- Defendant, Army violating 5 USC, Part III, Subpart A, Chapter 23, section 2302, Prohibited Personnel Practices.

- Defendant, Army claiming a Threat Defense and not proving same.

- The Office of Personnel Management to provide the Plaintiff Disability Retirement Benefits effective August 4, 2005.

Some of the above claims were previously addressed. Both the Plaintiff and the Defendant agree that the matter of Disability Retirement requires disposition. The Plaintiff wishes review of the Discrimination Claims, as the Department of Defense made public disclosure of facts that were previously not otherwise able to be legally obtainable by the Plaintiff, and the Plaintiff believes that the Termination was improper and violated several statues and the Plaintiff's constitutional rights to Due Process. From a purely legal perspective it has been over two years since the initial decision of the District Court and the entire matter should be at minimum reviewed compliance with current precedents of the federal courts as a matter of sound legal practice.

4. Additional Changes occurring after January 2008 and other background.

Mr. Hughes, Mr.Yuhas, and Ms. Grady - among others - have all left federal service.

The Department of Defense/Army publicly released the fact that approximately 50 percent of the military personnel are now or formerly under psychiatric treatment. The Plaintiff is still legally barred from obtaining similar data about the civilian employees; however, the civilian employees also include former military personnel, and while the military is no longer composed of a random selection of civilians, the military personnel still come from the civilian population indicating beyond a reasonable doubt that the civilian population has a significant percentage of employees currently or formerly under psychiatric care employed by the Agency. The fact of a significant portion of the employees being trained to kill, having killed or attempted to

3

kill other people impacts several areas including the previous discrimination judgment. The Agency formerly employing the Plaintiff employed between 100 and 300 current and former military personnel. The Agency was therefore assuming equal or greater risk - a major factor in the Plaintiff's removal - by employing between approximately 50 and 150 personnel with equal, or greater risk such as the tragedy in Fort Hood, Texas in December 2009, in comparison with the Plaintiff and stating the risk of employing the Plaintiff as too great thus treating the Plaintiff substantially differently than the other employees.

Aberdeen Proving Ground, the installation where the Plaintiff was employed for 21 years, has instituted mandatory quarterly suicide prevention training as a result of the above rate of psychological problems at the installation. As explained to the Plaintiff in his former military training in interrogation, psychological operations, escape and evasion placing a sane person in close proximity to person(s) with psychological problems (insane) is effective in a. eliciting information/increasing pliability, b. reduction of the psychological stability of the sane person, or c. both a. and b. above - and most likely c.

Other background:

The Plaintiff was medically removed from an abusive supervisor, Charles Joseph Schertz, in December 1992 after 5 years and after multiple requests for reassignment in the last year. The record was referred to briefly in the Plaintiff's medical records; however, the record and related documents were removed for some unknown reason and the Form 52 simply indicated a transfer. Mr. Schertz preferred argument as his form of communication as he found it more efficient. Mr. Schertz stated to the

4

Plaintiff shortly before Mr. Schertz retired why he had targeted the Plaintiff. The
Plaintiff, a senior grade employee, had not applied for a "Super Grade" position that Mr.
Schertz had advertised in the Merit Promotion System and neither did any of over 1500
other individuals because of his abusive nature/poor reputation. Mr. Schertz was nothing
if not blunt. Mr. Schertz statement to the Plaintiff was made nearly 10 years after the
"offense" and Mr. Schertz was not an emotional man either - but he had tears in his eyes
as he emphasized how embarrassed he was at having to re-advertise a "Super Grade"
position. The Plaintiff was not the only victim of Mr. Schertz. The Plaintiff watched as
one of Mr. Schertz employees was carried out and loaded in an ambulance shortly before
Mr. Schertz was transferred to be the Plaintiff's second level supervisor. One of the
Plaintiff's coworkers was off for 6 months recovering from Mr. Schertz abuse as she later
related to the Plaintiff. Mr. Schertz preceded to blame Mr. Subrizi for the Plaintiff's
transfer after the Plaintiff left. Mr. Subrizi had a major improvement in his demeanor
observed by the Plaintiff when he successfully transferred out from under Mr. Schertz
supervision. Mr. Schertz after more events was eventually promoted to supervising
handi-capable volunteers planting trees in the industrial area for about a year.

One of the arguments for the Plaintiff's removal at his MSPB hearing was a
"Schertz Style Discussion" that ensued when Technical Director, who also argued at
length with Mr. Schertz, planned to again place the Plaintiff under Mr. Schertz when after
a year of planting trees had not manipulated Mr. Schertz into retirement. The
management reorganization included placing the Plaintiff under his former supervisor,
Mr. Subrizi, who had his career sidetracked by Mr. Schertz and took the brunt of Mr.
Schertz wrath when the Plaintiff was transferred. Mr. Subrizi's demeanor became

depressed, apprehensive, and more reserved shortly after learning he would again be under Mr. Schertz supervision. A meeting, for the personnel to be re-assigned under Mr. Schertz, was unfortunately held in a building that had several brawls per year during the Plaintiff's tenure and was where the "Hot Heads" were sent. The Technical Director, it should be noted, got removed occasionally from high level meetings for his demeanor - he too would argue like Mr. Schertz. The Technical Director went for a Schertz style discussion with the Plaintiff, which would shock most people from saying another word, when the Plaintiff disagreed with his position on moving Mr. Schertz back into a supervisory position. The Technical Director found Plaintiff was accustomed to Mr. Schertz style. Over the year and change the Plaintiff was out from under Mr. Schertz supervision the Plaintiff was repeatedly requested to go over and deal with program problems caused by Mr. Schertz and the Plaintiff was effective in dealing with Mr. Schertz while getting the problems fixed - it was much different dealing with Mr. Schertz when the relationship was not boss-employee, but Lead Directorate and Mr. Schertz in the Support Directorate. The Plaintiff came right back to the Technical Director in Schertz style. Most of the 30 people there had never witnessed a discussion that intense and a moment later Mr. Subrizi and 4 other people tackled the Plaintiff because the history was a brawl was about to ensue. A Schertz style argument normally ran 5 to 20 intense minutes. A day or so later, Mr. Subrizi came to me, red in the face, aggressively shaking a pile of papers, and with a raised voice stating that he had 18 forms he had written up others had signed, and 3 others that individuals had written up. The forms flailing in his hand was the last the Plaintiff saw of the form letters and the Plaintiff did not hear about the form letters again until his removal proceedings 10 years later. And it

should be mentioned that the account in the form letters apparently stopped just before Mr. Subrizi's assault upon the Plaintiff. This type "dirt file" was formerly held to be improper if not adjudicated within 6 months and yet 10 years later the Plaintiff was subjected to the innuendo of a matter that did not have the merit to be pursued 10 years previously.

It should be noted that in 1992 there were NO CONDUCT ISSUES. The Plaintiff dutifully sought medical treatment. One of the less fortunate aspects of the treatment was the need for sick leave from Mr. Subrizi's perspective. Mr. Subrizi went from nearly the lowest number of hours per employee of sick leave usage per leave year to nearly the highest number of hours per employee of sick leave usage per leave year between October 1992 and December 1992. Mr. Subrizi did not receive an award for low number of hours per employee of sick leave for the 1992 leave year as a result of the Plaintiff's medical treatment. The importance of the sick leave award to Mr. Subrizi can be partially gleaned from his communication with occupational health. See Attachment 4. The Plaintiff's blood pressure had risen under Schertz' abuse. After treatment, without drugs, and after transfer from under Mr. Schertz supervision the Plaintiff's blood pressure returned the normal range. The Plaintiff's physician advised the Plaintiff that short periods, under a week, of elevated blood pressure were normal and there was no problem as long as it went back down or progressively back down.

February 2005 ended up being slightly different than 1992. The Plaintiff had contracted a severe cold around the 5th of February. The cold caused the Plaintiff to loose sleep and his blood pressure to elevate. The meeting with Ms. Grady and Mr. Dalton on the afternoon of 7 February caused the Plaintiff to loose about 6 hours of sleep

on top of the cold symptoms. Mr. Yuhas message of the 8th upset the Plaintiff as he normally drove to all his TDY points. The upset reaction of the Plaintiff was abnormal for the Plaintiff, and in hindsight a sign that the Plaintiff's emotional state had significantly been altered from his normal state. The Plaintiff was excused to go home - the length of the excused period differs between the memories of the Plaintiff and Mr. Yuhas. By the afternoon 9 February the Plaintiff's medical condition had deteriorated sufficiently that he was readily able to be brow beat into the altered mental state that it was more important to return to work on the morning of 10 February than to obtain life and career saving medical treatment.

The Plaintiff had worked most of his career outside exposed to temperature extremes and in environmental chambers. The Plaintiff had medical clearance to work in temperature extremes from US Army occupational health and annual examinations. The Plaintiff had multiple occasions where heat stress occurred resulting in diminished or loss of color vision and tunnel vision - normally treated by a canteen of water over the head and relocation to an air-conditioned area. The Plaintiff had always been successful in getting to a rest area and recovering on his own. By the time the Plaintiff arrived in Mr. Yuhas' office at about 11AM, the Plaintiff had largely lost color vision and his vision was tunneling; however, the Plaintiff was in a cool office environment in February. The e-mail that Mr. Yuhas was so desperately intent upon sending to Ms. Tredway - Human Resources - while the Plaintiff was in his office, at the end of Attachment 2, clearly shows that Mr. Yuhas thoughts and attentions were solely directed toward writing up the Plaintiff, for Mr. Yuhas failure to communicate, and to keep the Plaintiff at his desk until Mr. Yuhas was finished with his task in dealing with the Plaintiff. Mr. Yuhas' actions and

were definitely not toward obtaining medical aid for the Plaintiff which Mr. Yuhas had already dismissed and denied in two different earlier actions that morning. The e-mail attachment ended abruptly in mid sentence it should be noted. All the recorded actions of Mr. Yuhas until shortly after Mr. Yuhas and Ms. Tredway entered the Plaintiff's office show no thought by Mr.Yuhas toward obtaining aid for the Plaintiff despite Mr. Yuhas after the fact statements to the contrary. In fact, Mr. Yuhas demonstrated continued intent and focus toward writing up the Plaintiff by finishing the above e-mail attachment amid other unscheduled tasks thrust up Mr. Yuhas despite later further statements that he was shaken and could not focus his thoughts.

Mr.Yuhas previously stated that he felt the Plaintiff would never work again unless an employer needed his skill set. Another Army supervisor recently stated in the Plaintiff's presence that any employee who did not resign rather than be fired would never be hired in either the public or private sector again. The Plaintiff has experienced difficulty in securing any employment and has only been employed for approximately 5 of the last 59 months. The employment only lasted as long as the employer needed the Plaintiff's skill set. The Plaintiff's wife moved out January 1, 2010. The Plaintiff has still been unable to secure a means of supporting his son or himself. There are between 10,000 and 20,000 employed people in the Plaintiff's county with less than 500 job openings expected by the end of the year and there are also people from 3 neighboring states applying in the for jobs in the Plaintiff's county and the Plaintiff has also applied in neighboring counties and states too. The government instituted a zero tolerance policy and private industry followed suit. Once labeled unable to perform to a zero tolerance

policy an employee is effectively disabled. The removal has effectively left the Plaintiff unemployable and hence disabled.

A further background is provided at Attachment 1.

5. ISSUES, SUPPORTING FACTS AND ARGUEMENTS:

**Issue 1.**

The removal of the Plaintiff was unreasonable, the agency management involved in the removal were statutorily barred from the process, and the Plaintiff's civil rights to "Due Process" and "Fundamental Fairness" were violated when the agency used statutorily barred management to perform the disciplinary action.

**Supporting Facts and Argument.**

The investigation was performed by Ms. Grady, newly promoted by Mr. Yuhas, the aggrieved party, to a position subordinate to him. The Notice of Proposed Removal(NPR) signature authority was Mr. Yuhas, the aggrieved party, fiscally responsible to the government for the $2600 computer on his hand receipt damaged by the Plaintiff; he also claims that he had his personal property damaged by the Plaintiff, and he later alleged assault by the Plaintiff (approximately one month after the incident, possibly to bolster his case to remove the Plaintiff). The interview conducted by Detective Real catches Mr. Yuhas with a question Mr. Yuhas was apparently unprepared to answer - Q: What was the attitude of Mr. Dedrick when he lifted your desk? A: Frustrated. - See Attachment 2. The answer, frustrated, does not fit with the theme of violence the agency later portrays. Both Ms. Grady and Mr. Yuhas submitted statements showing extreme bias against the Plaintiff. See Attachment 2. The Decision Notice of Removal(DNR) signature authority, Mr.

Hughes, condoned Ms. Grady's performance of the criminal act of investigating the

incident, allowed Mr. Yuhas to perform a criminal act of authoring the NPR, and

obstructed justice by not reporting the crimes, a duty of his position under the law.

The Defendants had approximately 40 other managers not statutorily barred who were

available to perform their inherent right to management, without committing

violations of the Plaintiff's civil rights to due process and unbiased administration of

discipline.

**Issue 2.**

Absolution versus Mitigation.

**Supporting Facts and Argument.**

The Defendant is correct that absolution is not a legal precedent and has

inherently been at the sole discretion of the agency.

Mitigation is, however, the legal precedent - largely held in the Douglas

factors. The Defendant addressed the Douglas factors, even admitting the Plaintiff

had favorable Douglas factors, and then dismissively stated that the factors did not

warrant reduction of choosing the most severe disciplinary penalty for a single act -

charged as multiple acts - lasting approximately 30 seconds to a minute out of the

Plaintiff's 24 year career. It appears that the Defendant did not consider mitigation as

anything more than some superfluous rhetoric that they were required to include in

their paperwork.

The Defendant employs hundreds of active duty, reserve, and former soldiers,

along with the other civilian employees in the agency from which the Plaintiff was

removed. The soldiers are trained to kill, and given the multiple deployments to Iraq

and Afghanistan, many the soldiers have either attempted to kill or actually killed

people. The embedded reporters with the deployed soldiers noticed that some of the

soldiers were turning up in odd places, such as face down in the dirt ahead of the

forward line of battle without their weapon or gear. Some of the soldiers

subsequently were open about what happened, relating that they were having

psychiatric problems and their medications ran out, they did not get the opportunity to

take the medications, the medication balance was not correct, and other similar

problems occurred. The Defendant, as a result of subsequent inquiries has recently -

since the District Court decisions - publicly admitted that approximately one half of

the soldiers are actively, or formerly been, treated for psychiatric conditions. The

probability that the Defendant is currently employing multiple personnel willing to

kill for their country with an active or formerly treated psychiatric condition is near

100 percent in positions such as that the Plaintiff served. The Defendant's position

with respect to mitigation is UNREASONABLE. The Defendant portrayed the

Plaintiff tipping a desk as "Columbine". See Attachment 2. The Defendant stated they

would not accept a "non-zero" probability that the Plaintiff could have another

incident. This is unreasonable - all people have a "non-zero" probability of having an

incident similar to the Plaintiff. The Defendant has no employees with a "non-zero"

probability of having an incident similar to the Plaintiff. The Defendant clearly has

held multiple standards, which are otherwise not in accordance with law, and held the

Plaintiff to a higher standard. The Defendant is willing to risk employing personnel

with psychiatric problems who kill for their country, and then claims that the risk is

too great to employ a person who has tipped a desk because of the potential danger to other employees. The Defendants' position is unreasonable, arbitrary, and capricious.

The statements of Mr. Yuhas in Attachment 2 go even further. Mr. Yuhas, the offended party and a supervisor for over 15 years, states that a "new policy" should be in place for the Plaintiff of "zero tolerance". Ms. Grady, with 2 months as a supervisor, touches on the actual policy, in the third paragraph of her memorandum, of appropriate reprimand and transfer. One may also note the striking similarities of Mr. Yuhas' and Ms. Grady's impact memos, which they claim to have written independently with no knowledge of the others' memo. Mr. Yuhas even went so far as to state "The point here was, basically, to adopt a zero tolerance policy, and that is why I wrote it to that effect", as stated in the deposition of Mr. Yuhas on page 115, line 3 provided in Attachment 2. The Plaintiff was subjected to a special new policy resulting in his removal, instead of proper investigation, appropriate reprimand, and transfer. Again, this is not fair and equal treatment and runs counter to the principles leading to the statue of Prohibited Personnel Practices.

**ISSUE 3.**

The decisions of the OPM and the Administrative Judges were duplicitous.

**Supporting Facts and Argument.**

The Plaintiff argues that the Administrative Law Judge may not reject the determination that the Plaintiff cannot perform useful and efficient service made in the removal action by using the same medical evidence that was rejected in the removal case in making a determination of the Plaintiff's ability to perform the duties

of his position. The Defendants' position determination should have overridden the medical determination as the medical determination was independent of the position requirements and the position determination overrides the medical determination. This case is based upon Civil Service requirements, where the position requirements are an overriding factor- not just basic functionality, as in social security. See *Bruner v. Office of Personnel Management,* 996 F.2d 290, 294 (Fed. Cir. 1993), and Quiles, *Quiles-Quiles v. U.S. Postal Service*, 439 F.3d 1 (1st Cir. 2006). The Administrative Law Judge did not appear to address the conduct portion as there is no clear basis in the disability retirement law other than to state that clearly and unequivocally, conduct is a basis upon which disability retirement is granted, and is also touched upon in the mental health area. The Defendants used the removal for conduct as a basis and further argument to deny disability retirement to the Plaintiff, whereas the removal action should have been a basis for providing disability retirement.

The Plaintiff would also suggest that the standards are unreasonable. The Defendants' position and argument are duplicitous, and otherwise arbitrary and capricious, in that they hold the position that the Plaintiff is too sick to work while being not sick enough to qualify for disability retirement, and they require a concrete basis for psychiatric condition. As to conduct, the Defendant again used two different standards to evaluate the Plaintiff, one for removal and one for disability retirement. As suggested above, this goes deeper than the letter of the law; it goes to "fundamental fairness". Applying two different standards to the same event is not fair treatment. Neither is requiring a laboratory test, x-ray or other concrete test to apply to the field of psychiatry. Nor is in one case using a medical opinion from an

14

admittedly unqualified individual to controvert the testimony of an impeccably qualified individual in the case of the removal, and then finding just the opposite merely because the defendant now supports rather than rejects the impeccable medical opinion because the Defendant now uses the opinion as a basis for rejecting disability retirement. The Plaintiff suggests that in his case one "standard determination" would be fair - that is, either the Plaintiff's mental health and/or conduct is acceptable for continued employment, or the Plaintiff's mental health and/or conduct is unacceptable and warrants disability retirement.

**ISSUE 4.**

The MSPB applied the wrong law.

**Supporting Facts and Argument.**

The Administrative Law Judges should have admonished the Defendant for performing Prohibited Personnel Practices, and protected the Plaintiff in the removal process.

The MSPB mission is particularly stated to **protect employees from Prohibited Personnel Practices**. The parties performing the investigation and proposing removal were in violation of 5 USC, Part III, Subpart A, Chapter 23, section 2302, Prohibited Personnel Practices. The determination authority was charged with the duty to report the violations rather than order the violations to be performed and condone such actions.

**ISSUE 5.**

The MSPB incorrectly decided and failed to take into account some facts.

**Supporting Facts and Argument.**

The facts themselves may not be reviewable as the Defendants claim; however, the decision to take into account, the reasonableness of the requirements, and determination of fundamental fairness are reviewable.   The fact not considered was that the Defendants should have been required to make one decision: either "fit for duty and continued employment", or "unfit for duty and provided disability retirement".   See *Bruner* and *Quiles-Quiles*.

**ISSUE 6.**

The MSPB failed to consider important grounds for relief.

**Supporting Facts and Argument.**

As the Plaintiff argues above and in past proceedings, the settled law is that objective medical evidence is only one of several factors to be considered.

**ISSUE 7.**

There are other reasons why the MSPB's decision was wrong.

**Supporting Facts and Argument.**

The disability retirement law 5 C.F.R. § 831.1203 does not have a reasonable standard for the determination of a conduct related disability retirement.   The Plaintiff would suggest that the conduct standard for disability retirement would be the same as the standards of conduct used for removal, and if a determination is made for removal, the determination should stand for the disability retirement determination, for fundamental fairness under the law.

The Plaintiff was removed and not offered any position for continued employment. The Disability Retirement Application, in the portion filled out by the Defendant, is where the correct assessment of what happened is found. The Defendant checked the box that said "Re-assignment is not possible. There are no vacant positions at this agency, at the same grade or pay level and tenure within the same commuting area, for which the employee meets minimum qualification standards." The Plaintiff went even further by requesting assignment to "other agencies", and was verbally denied reassignment to any open positions for which he had previously been qualified for approximately 18 years. The Plaintiff filed for disability retirement on the basis that if his condition was so severe as to require removal, and no position was offered to him for continued employment he should, as provided by statute, receive disability retirement. The statute specifically states both mental health and conduct are conditions entitling the Plaintiff to disability retirement, in addition to other unspecified medical conditions. The statue requires that the Plaintiff meet only one condition - medical, mental health or conduct for entitlement to disability retirement, and meeting more than one requirement is not a basis for denial of benefits. The Defendants in the removal certified and approved to the OPM standards that the Plaintiff was "no longer able to provide useful and efficient service" - that is Inability to Perform. The Defendants then turned around in the disability retirement case and denied benefits based upon the Plaintiff being able to provide useful and efficient service, while not retracting the removal action which held the Plaintiff being "no longer able to provide useful and efficient service". The disability retirement application process required the Plaintiff to submit medical

17

reports, even though a disability retirement based upon conduct discharge should not require medical statements, in a one size fits all approach. The one size fits all approach is similar to that used in *Vanieken-Ryals v. Office of Personnel Management*, 508 F.3d 1034, where the Defendant required concrete medical evidence such as x-rays and laboratory tests to substantiate a psychological condition. Dr. Rubin was specific in that the Plaintiff's conduct would likely not recur if "reasonable" measures were followed, and that the conduct would likely recur if the Plaintiff were subjected to stressors with no ability to mitigate/relieve the stressors, such as the day of the incident where the supervisor repeated denied the Plaintiff leave to seek medical treatment and repeatedly directed him "back to his desk" or "back to his office".

The Plaintiff, at the time of his removal, had 1884 hours of sick and annual leave. See attached at pages 13 and 14. The Plaintiff's accumulated leave was well in excess of the 1695 hours of leave necessary when coupled with the 312 hours of sick and annual leave (4 sick, 8 annual per pay period times 26 periods) and 80 hours of holiday leave acquired during a leave year necessary to meet the 2087 hours that constitutes a pay year/year of service. As the Plaintiff was not given the option to recover, the Plaintiff's condition was assessed by the Defendant as to not be recoverable within a year as the Plaintiff had adequate leave to provide over a year for recovery. The Plaintiff clearly met the requirement that his condition would last at least one year.

**ISSUE 8.**

18

The Plaintiff's medical condition has and would have lasted more than one year.

**Supporting Facts and Arguments.**

The Plaintiff, at the time of his removal, had 1884 hours of sick and annual leave. See attached at pages 13 and 14. The Plaintiff's accumulated leave was well in excess of the 1695 hours of leave necessary when coupled with the 312 hours of sick and annual leave (4 sick, 8 annual per pay period times 26 periods) and 80 hours of holiday leave acquired during a leave year necessary to meet the 2087 hours that constitutes a pay year/year of service. As the Plaintiff was not given the option to recover, the Plaintiff's condition was assessed by the Defendant as to not be recoverable within a year as the Plaintiff had adequate leave to provide over a year for recovery. The Plaintiff clearly met the requirement that his condition would last at least one year. Further, the Plaintiff still has the same medical conditions over 4 years later and emotions/emotional reactions seem to surface more easily as time passes although there have been no further major incidents.

**ISSUE 9.**

The Defendant has failed to pay the Plaintiff for 8 hours of accumulated annual leave.

**Supporting Facts and Argument.**

The Plaintiff had accumulated 33? hours of annual leave as shown on the Plaintiff's Leave and Earnings statement. See Attachment 3. The Defendant only

reimbursed the Plaintiff for 325 of the 333 hours leaving the Plaintiff short 8 hours of pay as shown in Attachment 3.

6.      The relief the Plaintiff wants the court to order is:

- Reinstatement to my former position (or The Office of Personnel
  Management to provide the Plaintiff Disability Retirement Benefits
  effective August 4, 2005).

- Back pay and benefits.

- Repayment and restitution of Thrift Savings Plan funds as if never
  separated.

- Costs and attorneys fees.

- Additional expenses resulting from separation.

30 June 2010

Edward Charles Dedrick

64 Quaker Lane

North East, Maryland 21901

Phone/Fax (410) 658-5927

e-mail: ededrick@zoominternet.net